HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

LUIS HERNANDEZ SANDOVAL,

                Defendant.

CASE NO. CR14-5105RBL

ORDER

THIS MATTER is before the Court on Defendant Sandoval's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release). [Dkt. #564]. The Court has reviewed the materials filed for and against the motion. Oral argument is not necessary. The Court **DENIES** the motion for the reason proffered by the Government. Sandoval is a serious criminal who spread pain and suffering to the communities of Puget Sound, he has serious medical conditions and has been incarcerated at the U.S. Medical Center for Federal Prisoners (USMCFP) at Springfield, Missouri, which is best capable to deal with the COVID-19 pandemic. This Court does not believe "Extraordinary and Compelling Circumstances" justify reduction in Mr. Sandoval's sentence.

The Court accepts the analysis provided by the Government as follows:

# I. FACTS

**A.  Sandoval's Conviction and Sentence.**

Sandoval was a leader of a drug distribution ring in Pierce County. As shown by a multi-month wiretap investigation, Sandoval's role in the conspiracy was to arrange the shipment of large loads of drugs to re-distributors. Sandoval coordinated the shipment of methamphetamine, from out of state, into the Tacoma area. Sandoval also coordinated the acquisition of heroin from a local supplier and directed it to others to re-distribute. To receive these shipments of drugs, and to send these drugs to re-distributors, Sandoval worked closely with his sons, Juan Hernandez and Jaime Hernandez, who were also defendants in this case.

On February 25, 2014, Sandoval was arrested along with other members of the conspiracy. Sandoval has remained in custody since that date. His current projected release date is September 2, 2022.

On January 23, 2015, Sandoval pleaded guilty to Conspiracy to Distribute Methamphetamine and Heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. At his sentencing in April 2015, based on his various health issues (further described below), Sandoval sought a five-year sentence, the mandatory minimum for the offense to which he pleaded. The Court sentenced Sandoval to 120 months' imprisonment. Sandoval's sons were both sentenced to 12-year terms of imprisonment.

**B. Sandoval's Medical Conditions.**

As set forth in the presentence report, Sandoval has a series of serious medical conditions. He suffered a stroke in 2005 that impacted the use of his right side. He has type II diabetes which led to a kidney transplant in 2011. He also had elevated blood pressure. These issues impaired his mobility and at that time Sandoval used a cane and/or wheelchair.

Based on his prison medical records, Sandoval continues to suffer from the same conditions. (He is incarcerated at the U.S. Medical Center for Federal Prisoners (USMCFP) at Springfield, Missouri, because of his medical needs.) Currently, Sandoval continues to take immune-suppressive medications related to his kidney transplant. He is taking heart medication. His diabetes appears to be causing him medical issues, including two diabetic issues in the past 8 months, including an incident where the doctors believed that he had seizures.

## II. ANALYSIS

**A.  The Legal Standards for Compassionate Release.**

As amended by the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A) permits an inmate satisfying certain conditions to file a motion with the district court seeking "compassionate release." Before such a motion can be filed, the statute provides that the defendant must either exhaust administrative review of the denial of a request made to the Bureau of Prisons, or wait until 30 days have passed after the request is made to the warden, whichever is earlier.  As relevant to Sandoval's motion, the statute now reads:

> (c) The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> >  (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > > (i) extraordinary and compelling reasons warrant such a reduction; or
>
> > > > * * *

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Congress directed the Sentencing Commission to draft the policy statement referenced in the statute in 28 U.S.C. § 994(f) which provides:

> The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

**1.      USSG § 1B1.13 Defines "Extraordinary and Compelling Circumstances."**

The policy statement referenced in 18 U.S.C. § 3582(c)(1)(A) and mandated by 28 U.S.C. § 994(f) is found at USSG § 1B1.13. It provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1) (A) Extraordinary and compelling reasons warrant the reduction;
>
>      (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

The Sentencing Commission's application notes to this policy statement provide further guidance. As directed by 28 U.S.C. § 924(t), the application notes define what constitute "extraordinary and compelling reasons" to support a reduction in sentence. Specifically,

application note 1 provides that extraordinary and compelling reasons exist under the following

circumstances:

    (A) Medical Condition of the Defendant. —

        (i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

        (ii)     The defendant is—

              (I)       suffering from a serious physical or medical condition,

              (II)   suffering from a serious functional or cognitive impairment, or

              (III)  experiencing deteriorating physical or mental health because of the aging process,
that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less

USSG § 1B1.13 cmt. n.1. The application note also provides that extraordinary and compelling

reasons may include certain described family circumstances, or other reasons as determined by

the Director of the Bureau of Prisons, and that "[t]he court is in a unique position to determine

whether the circumstances warrant a reduction (and, if so, the amount of reduction), after

considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy

statement, such as the defendant's medical condition, the defendant's family circumstances, and

whether the defendant is a danger to the safety of any other person or to the community." USSG

§ 1B1.13 cmt. n.4.

### 2. The Policy Statement Is Binding.

Based on the text of § 3582(c)(1)(A), the policy statement referenced in § 3582(c)(1), like that referenced in 18 U.S.C. § 3582(c)(2), *see* USSG § 1B1.10, is binding on this Court and controls how this Court is to exercise of discretion. *Cf. Dillon v. United States*, 560 U.S. 817, 827 (2010). In *Dillon*, the Supreme Court addressed the identical language if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" contained in 18 U.S.C. § 3582(c)(2). The Court held that based on this language, the Commission's pertinent policy statement is binding on district courts and any limitations contained in that Guideline is a limitation a district court's discretion to reduce sentences. *See Dillon*, 560 U.S. at 826.

*Dillon* emphasized that a sentence reduction under Section 3582(c)(2) "represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines." *Id.* at 828. Section 3582(c)(1)(A), like the companion statutory provision addressed in *Dillon*, also rests on a limited act of Congressional lenity. Both subsections follow the same prefatory language that makes unassailably clear that a court may only "modify a term of imprisonment once it has been imposed" under the limited circumstances set out in these two subsections. Given the parallel nature of the two statutory subsections, the only possible conclusion is that the policy statement referenced in 3582(c)(1)(A) must also be considered binding.

The fact that USSG § 1B1.13 has not been amended after enactment of the First Step Act does not alter that conclusion. Although the First Step Act removed the limitation that a motion could only be filed by the Director of the Bureau of Prisons, it did not change any of the statutory standards for relief, or suggest that there should be a broader interpretation of what constitutes an "extraordinary and compelling reason" beyond what is stated in the policy statement. Nor did

Congress direct the Sentencing Commission to change or expand this policy statement. Rather, Congress simply made it possible for a defendant to file a motion rather than retaining the Bureau of Prisons as the exclusive entity who could file a motion. *See United States v. Ebbers,* 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020) ("Congress in fact only expanded access to the courts; it did not change the standard.").

Therefore, as numerous courts (including a judge in this district) have found, this policy statement is still binding and must guide this Court's determination of whether the facts that the defendant has presented constitute "extraordinary and compelling reasons" and what situations other than the defendant's one medical condition might constitute such a reason. *See, e.g., United States v. Derico Fuller*, 17-CR-324-JLR, 2020 WL 2557337 (W.D. WA. May 20, 2020); *United States v. Garcia,* 2020 WL 2039227 (N.D. Cal. April 28, 2020); *United States v. Willingham,* 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Washington,* 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United States v. Willis,* 382 F.Supp.3d 1185, 1187 (D.N.M. 2019); *United States v. Lynn,* 2019 WL 3805349, at *5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields,* 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019); *United States v. Overcash,* 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019).

Moreover, courts reaching a contrary conclusion still find this policy statement to be helpful guidance regarding what constitutes an extraordinary and compelling reason to disturb the finality of a sentence. *See, e.g., United States v. Rivernider*, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019); *United States v. Fox,* 2019 WL 3046086, *3 (D. Me. July 11, 2019). This is particularly true where Congress chose not to disturb this policy statement or expand the

1  understanding of what constitutes extraordinary and compelling circumstances when it amended

2  this provision in the First Step Act.

3          Thus, before this Court may reduce Sandoval's sentence, applying the guidance in USSG

4  § 1B1.13, it first must determine whether the reasons the defendant has provided are

5  extraordinary and compelling. And if the Court concludes such a reason or reasons have been

6  provided, it must then consider whether a reduction in sentence is appropriate in light of the

7  factors in 18 U.S.C. § 3553(a) and the danger that Sandoval might continue to present to another

8  person or the community.

9  **B. Sandoval Has Not Met the Standard for a Reduction of Sentence.**

10         To be eligible for a district court's discretionary consideration of a reduced sentence

11  under this provision, a defendant bears the burden to show "extraordinary and compelling

12  reasons" that meet the high bar set by Congress and the Sentencing Commission for

13  compassionate release to be granted. *See Riley v. United States*, No. C19-1522 JLR, 2020 WL

14  1819838 at *7 (W.D. Wash. Apr. 10, 2020).; *United States v. Greenhut*, 2020 WL 509385, at *1

15  (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing entitlement to

16  sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir.

17  1998)). "To be faithful to the statutory language requiring 'extraordinary and compelling

18  reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not

19  expected to recover from. In general, chronic conditions that can be managed in prison are not a

20  sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at

21  *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant

22  suffering from severe back injuries and epilepsy); *United States v. Mangarella*, 2020 WL

23  1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary

24

and rare event." (citation omitted)). Rather, compassionate release should be for extraordinary circumstances. *See United States v. Johns*, 2019 WL 2646663, at *2–3 (D. Ariz. June 27, 2019) (granting reduction after 23 years of imprisonment for 81-year-old defendant with multiple serious medical conditions, including "severe heart disease" and a stroke from which he was not likely to recover, who had substantially diminished ability to provide self-care within the BOP).

This reluctance to view compassionate release too expansively is grounded in a concern that it could yield significant sentencing disparities. *Ebbers*, 2020 WL at *6 (S.D.N.Y. Jan. 8, 2020). Compassionate release is not a tool to "correct" a judgment. *Id.* Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. *See, e.g., United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (citing various pre-trial detention cases).

### 1. COVID-19 Alone Does Not Create an Extraordinary and Compelling Reason.

Sandoval is incarcerated at USMCFP-Springfield. As of May 22, 2020, there have been no reported cases of COVID-19 among the inmates and staff at this institution. Even though the defendant's age and health conditions place him in a category of individuals who are at increased risk of serious complications if they contract COVID-19, he must still establish that he would qualify for immediate release under § 3582. Under the Guidelines, a defendant must establish he is suffering from either a terminal illness or a "serious physical or mental condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13, cmt. n.1.

Here, given the nature of the facility, Sandoval has not met this standard. Moreover, the BOP also has been actively attempting to protect the health of inmates and staff. Consistent with

preexisting Pandemic Influenza Plan, BOP began planning for potential coronavirus transmissions in January 2020, by establishing a working group to develop policies in consultation with subject-matter experts in the CDC and using guidance from the World Health Organization.

BOP is already acting to remove particularly vulnerable individuals to home confinement using its authorities under 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g). BOP also was given additional authority under Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, to lengthen the maximum amount of time for home confinement under first sentence of § 3624(c)(2) and the Attorney General has made the necessary findings under the CARES Act to give the BOP the authority to act under this statute. Based on these statutes and various directive from the Attorney General since the start of the COVID-19 pandemic, some 3,179 inmates have been moved to home confinement.

Unfortunately, this is not an option that is available to the defendant even if he otherwise might qualify. That is because there is an order for his removal and an immigration detainer in place. Indeed, the BOP rejected Sandoval's request for early release because he does not have a viable release plan as a result of the immigration detainer.

Since the filing of the motion, the undersigned counsel has sought to find answers to the length of time that the defendant would need to remain at an ICE detention facility before his removal to Mexico could be effectuated. The Declaration of Supervisory Detention and Deportation Officer Russell Ussery explains this process. It involves getting appropriate clearance from Mexico and does not simply involve arranging transportation. Even if this Court were to grant his motion and the defendant is released from USMCFP-Springfield, the declarant

expects that he would then be held at an Immigration Detention facility for a period of at least 120 days before his removal to Mexico. *See* Exhibit 1, Ussery Declaration. Because parts of the process are beyond the control of the federal government agency involved, there is no assurance that the process could be completed in anything less than 120 days, and it may well be longer. Given that Sandoval is currently housed at an institution designed to provide extensive medical care to inmates, granting release would likely place him at greater risk.

Therefore, even acknowledging that the COVID-19 presents a health risk to everyone, including incarcerated individuals, there is no basis to conclude that Sandoval faces a significantly greater risk while in custody at USMCFP-Springfield than he would upon his release while in ICE custody pending removal.

### 2. Sandoval Has Failed to Establish He is No Longer a Danger

As a final matter, this Court may not reduce Sandoval's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13; *see also United States v. Gotti*, No. 02-cr-743-CM, 2020 WL 497987 (SDNY 2020) (finding that even if medically eligible, release was inappropriate because defendant poses a continuing danger to the public). This record precludes such a finding and prevents Sandoval from being released from government custody into the community.

Despite his serious health conditions, Sandoval was able to lead a drug trafficking organization prior to his incarceration. Through his contacts, Sandoval was responsible for importing and re-distributing significant amounts of methamphetamine and heroin. He may not have carried out the re-distribution, but he had responsibility. Nothing about the COVID-19 pandemic reduces the danger of drugs.

1

**III. CONCLUSION**

2

For these reasons, Sandoval's Motion for Compassionate Release is DENIED.

3

IT IS SO ORDERED.

4

Dated this 10th day of June, 2020.

5

6

Ronald B. Leighton
United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24